UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALVIN GRAY-EL,                            Case No.: 19-10952
     Plaintiff,
v.                                        Matthew F. Leitman
                                          United States District Judge

JENNIFER LOPEZ/NUYORICAN
PRODUCTIONS, INC., *et al.*                 Michael J. Hluchaniuk
     Defendants.                        United States Magistrate Judge
_____/


## REPORT AND RECOMMENDATION
## DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 26, 28)


## I.    PROCEDURAL HISTORY

Plaintiff Alvin Gray-El brought this action *pro se* against Jennifer Lopez,

Nuyorican Productions, Inc., NBC Universal Studios, Inc. ("NBC"),[1]  and Debbie

Allen/Freeze Frame Entertainment, LLC alleging copyright infringement under 17

U.S.C. § 501.  (ECF No. 1).  Gray-El also filed exhibits with his complaint.  (ECF

No. 7).  On August 23, 2019, defendants Lopez, Nuyorican Productions, and NBC

filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (ECF No. 26).  On

the same day, defendants Lopez and Nuyorican Productions filed a separate motion

---

[1] According to NBC, plaintiff improperly named this defendant as NBC Universal
Studios, Inc.  The correct name is NBCUniversal Media, LLC.  (ECF No. 26, PageID.147).
Plaintiff does not contest this correction.

to dismiss on the ground that this Court lacks personal jurisdiction over them.

(ECF No. 28).  The matter is fully briefed and is ready for report and

recommendation.

## II.   FACTUAL BACKGROUND

   A.   The Complaint

Gray-El's complaint is limited to the following statement:

> In 2009 I composed a television show called, "Let's Start
> the Dance" (see Exhibit 1).  I then proceeded to market
> my show by faxing a copy of the show and a letter to
> Debbie Allen/Freeze Frame Entertainment, LLC.  (See
> Exhibit 2), verification of fax.  In the letter, I stated that I
> had a dance reality show that I wanted to have on
> television.  I asked if she was interested in producing the
> show.  I did not hear back from her or her company.  On
> August 23, 2010, I had the show registered with the U.S.
> Copyright Office (Reg# PAu 3-516-902) (See Exhibit 3).
> May 8, 2017, I was advised that a show like the one that I
> had copyrighted was on television, and was being
> produced by Jennifer Lopez and NBC.  I attempted to
> contact NBC and Jennifer Lopez, but had no way of
> contacting her.  I sent a letter to NBC in July of 2017,
> notifying them of copyright infringement.  I did not
> receive a response.  It is my understanding that a show,
> like the one that I created, was [being] televised.  The[y]
> had taken my original expression and produced it on
> television.

(ECF No. 1, PageID.5).

   The exhibits to the complaint shed more light on the claims.  Gray-El sent a

letter to Debbie Allen Dance Academy on June 4, 2010 asking Debbie Allen to

produce his dance reality show.  (ECF No. 7, PageID.69-70).  On May 9, 2011, Gray-El sent a letter to Nuyorican Productions, Inc., to the attention of Jennifer Lopez.  He explained that he wrote and created "a dance reality show that has worldwide appeal, in music and dance styles from around the world."  (ECF No. 7, PageID.76).  Gray-El also said that his "highly competitive dance show . . . will display competitors who are a step above the rest . . . showing dance moves that are fast and fierce, along with playing the best in dance music that has universal appeal."  He told Lopez he would disclose the treatment and name of the show once she signed a confidentiality and non-disclosure agreement.  (*Id.*).

On May 2, 2017, Gray-El sent a letter to three NBC executives claiming that the show *World of Dance* infringes on his copyrighted work, *Let's Start the Dance*.  (ECF No. 7, PageID.78-83).  He informed the executives that he sent Lopez a letter on May 9, 2011 about the show and accused her of failing to research whether there was a copyright for the dance reality show.  He also questions how Lopez came up with the name "World of Dance."  Gray-El says that Debbie Allen had a copy of the treatment for *Let's Start the Dance* "under false pretenses."  According to Gray-El in this letter, he sent the treatment to Debbie Allen via fax because she was interested in producing his dance reality show.  But, an associate, Crystal Adams, informed him that Debbie Allen did not accept unsolicited material.  Since the treatment was sent to Allen on her request, Gray-El insists it was not

unsolicited material.  He asked Crystal Adams to return the treatment to him, but he did not get it back.  Gray-El sent this same letter again to NBC's general counsel on May 29 and July 28, 2017.  (*Id.* at PageID.84-86).

B.      Summary of *Let's Start the Dance*

The last exhibit to the complaint is the treatment for *Let's Start the Dance*. (ECF No. 7, PageID.93-98, Exhibit 4).  The show is described as "a competition in world dance and music."  *Let's Start the Dance* describes a reality tv dance competition show wherein dancers who are a "step above the rest" compete against each other through three rounds of competition to determine who is the best dancer in the world.  The dance component of the show begins with auditions. Contestants who make it past the auditions then chose a partner and choose three dances and three songs.  The treatment describes the dance and song selection in contradictory terms—both as a random selection and as chosen by the dancers. First, the treatment indicates that the dancers will draw from a box three dances and three songs to which they will compete.  Later, the treatment indicates that the dancers will select dances and songs of their liking.  (*Id.* at PageID.94, 95).  Once the songs and dances are chosen, the dancers will research the history of their dances and their songs in advance of their performances.  The dance styles "can be from any origin and/or nation."  (*Id.* at PageID.94-95).  There will be two categories of dances: fast and slow.  (*Id.* at PageID.95).

Dance experts (also referred to as celebrity experts in the treatment) will judge the dance performances; a combination of the total points for each competing couple will be the final score. The dance score will be added to the music score for the total, final score. The dances are judged on timing, execution, and difficulty. (*Id.* at PageID.94). The music is judged by the live and television audience with a point system ranging from 10-110. That the audience will judge the music is stated multiple times in the treatment, except one instance. At one point, the treatment explains that there will be two music judges in addition to three dance judges. (*Id.* at PageID.95, 97). Thus, it is not clear if Gray-El intends the audience to judge the music in conjunction with two judges, or whether the audience alone will judge the music, and the reference to two judges was a mistake.

In addition to judges, there will be five "dance coaches" who are choreographers. These dance coaches will assist the contests with some of their more difficult moves. (*Id.* at PageID.97).

*Let's Start the Dance* is intended to have "fancy dancers." These dancers are for "entertainment purposes only," and are intended to perform during the half time of the show. (*Id.* at PageID.96). There is also a band that will be selected after a round of auditions. The band is intended to play music "during the show and commercials." (*Id.* at PageID.97). Finally, there will be two hosts: one male,

one female.  (*Id.* at PageID.97).  The winning dance pair will take home a trophy, cash, "special" entertainment contracts, and endorsements.  (*Id.*).

    C.    <u>Summary of *World of Dance*</u>

*World of Dance* is a dance competition show.  The show is described as bringing "the world's elite dancers together to compete in epic battles of artistry, precision and athleticism."  (ECF No. 26-3, PageID.186).  There is an "unlimited range" of dance styles on the show.

The contestants are chosen from "qualifying events" around the nation (presumably the United States) and from online submissions.  Once selected, the competitors are divided into four groups based on age and number of dancers in each group as follows: Junior (17 years and under, 1-4 dancers), Junior Team (17 years and younger, 5-15 dancers), Upper (18 years and older, 1-4 dancers), and Upper Team (18 years and older, 5-15 dancers).  (*Id.*; Exhibit B, Episode 301, at 1:05-1:15).  The competition consists of five rounds: The Qualifiers, The Duels, The Cut, Divisional Final and World Final.  (ECF No. 26-3, PageID.186).  To advance from the Qualifiers to the Duels, contestants must score 85/100 or better.  (Exhibit A, Episode 301, at 08:40-08:45).  In The Duels, the contestants, or "acts," "fight head to head;" the highest scoring act wins a place in The Cut, while the lower scoring act is eliminated.  (*Id.* at Episode 305, at 0:50-1:10).  However, the two highest scoring eliminated acts go head to head in the Redemption round.  The

winner advances.   (*Id.* at 1:12-1:32).  In The Cut, the top six acts from each

division compete for the final three spots in the Divisional Final.  (*Id.* Episode 309,

at 0:44-0:52).  In the first four rounds, dancers compete only within their division.

In the World Final, the winners from each division will compete against each other

for the grand prize of $1 million.

The performances are judged by three judges: defendant Jennifer Lopez, and

non-parties Derek Hough and NE-YO.  (ECF No. 26-3, PageID.186).  There is one

host.  (*See* ECF No. 26-2, Exhibit A).

## III.   ANALYSIS AND RECOMMENDATIONS

A.   Rule 12(b)(2) Motion to Dismiss

On a motion to dismiss for lack of personal jurisdiction pursuant

to Fed.R.Civ.P. 12(b)(2), the plaintiff has the burden of establishing that the

exercise of jurisdiction over the defendant is proper.  *Neogen Corp. v. Neo Gen

Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002).  Where, as here, there has been

no evidentiary hearing regarding personal jurisdiction, a plaintiff "need only make

a *prima facie* showing of jurisdiction."  *Id.* (quoting *CompuServe, Inc. v.

Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996)) (internal quotation marks omitted).

However, it is insufficient for a plaintiff to merely reassert the allegations

contained in its pleadings.  *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.

1991).  The plaintiff must articulate specific facts to show that the court has

jurisdiction.  *Id.*  The court must then consider all of the facts presented in the

pleadings and affidavits in a light most favorable to the plaintiff, and does not

weigh any contrary assertions offered by the defendant.  *Intera Corp. v.*

*Henderson,* 428 F.3d 605, 614 (6th Cir.2005).

In the view of the undersigned, it is appropriate in this case to decide

defendants' motion on the written submissions alone.   Defendants do not offer any

evidence to dispute the allegations in Gray-El's complaint.  Rather, they argue that

the allegations in the complaint, on their face, are insufficient to establish personal

jurisdiction over them.  Thus, the undersigned must determine if Gray-El has

satisfied his burden of making a "*prima facie* showing that personal jurisdiction

exists ...."  *Theunissen*, 935 F.2d at 1458.

As for the allegations in the complaint, they are rather bare.  Gray-El lists

Lopez and Nuyorican Productions as residents of California.  (ECF No. 1,

PageID.2, 4).  There is no other allegation in the complaint regarding their

citizenship and personal jurisdiction.

Gray-El asserts that jurisdiction in this case is based both on diversity of

citizenship and federal question (he asserts a claim under 17 U.S.C. § 501).   A

federal court's exercise of personal jurisdiction in a diversity of citizenship case

must be both (1) authorized by the law of the state in which it sits, and (2) in

accordance with the Due Process Clause of the Fourteenth Amendment.  *Reynolds*

*v. Int'l Amateur Athletic Fed'n,* 23 F.3d 1110, 1115 (6th Cir. 1994).  A federal court that has subject matter jurisdiction on the basis of a federal question, however, is not always so limited. In such cases where the federal law at issue contains a nationwide service of process provision, a court need only consider the Fourteenth Amendment's due process limitations, as the nationwide service of process provision "confer[s] personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States." *Med. Mut. of Ohio v. deSoto,* 245 F.3d 561, 567 (6th Cir. 2001) (quoting *United Liberty Lobby Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir. 1993)).

In this case, the law giving rise to federal question jurisdiction, 17 U.S.C. § 501 *et seq.*, does not contain a nationwide service of process provision.  *See also Tomelleri v. MEDL Mobile, Inc.*, 657 Fed. Appx. 793, 795 (10th Cir. 2016) ("[T]he Copyright Act . . . does not provide for nationwide service of process.").  In federal question cases where the law at issue does not contain a nationwide service of process provision, the court must follow Rule 4(k) of the Federal Rules of Civil Procedure, which "limits a court's exercise of personal jurisdiction to persons who can be reached by the forum state's long-arm statute."  *Humantech, Inc. v. Ergonomics Pluc, Inc.*, 2015 WL 1492224, at *3 (E.D. Mich. Mar. 31, 2015) (citations omitted).  Accordingly, the Court's analysis in this case proceeds as it would in a diversity case, assessing personal jurisdiction under both Michigan's

long-arm statute and the Due Process Clause of the Fourteenth Amendment.  *See Bird v. Parsons,* 289 F.3d 865, 871 (6th Cir. 2002) ("Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[ ] due process.'" (alterations in original) (quoting *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 954 F.2d 1174, 1176 (6th Cir. 1992)).

There are two types of personal jurisdiction: general and specific.  *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

1.    General Jurisdiction – Corporate Defendant

Pursuant to Fed. R. Civ. P. 4(k)(1)(A), a defendant is subject to personal jurisdiction in a federal district court if it would be subject to the jurisdiction of a court of general jurisdiction in the state in which the district court sits.  To establish general personal jurisdiction over the corporate defendant (Nuyorican Productions) under Michigan law, one of the following must exist: (1) incorporation under the laws of this state; (2) consent, to the extent authorized by the consent and subject to the limitations provided in section 745; or (3) the carrying on of a continuous and systematic part of its general business within the

10

state.  Mich. Comp. Laws § 600.711.  There appears to be no basis in the record

here to conclude that this Court has general personal jurisdiction over Nuyorican

Productions under the general jurisdiction statute.  Nuyorican's secretary, Barry L.

Hirsch, provided an affidavit in which he stated that Nuyorican is an entertainment

services corporation registered in the State of California.  (ECF No. 28-3,

PageID.224).  He further stated that Nuyorican Productions has never maintained

an office in Michigan, transacted any business in Michigan, and does not regularly

do or solicit business in Michigan.  Based on his information and belief, Nuyorican

has not entered into contracts in Michigan relating to *World of Dance* and has not

participated in any production activities associated with the show in Michigan.  (*Id.*

at PageID.225).  Gray-El did not provide any statement of his own contending that

Nuyorican's activities satisfy Michigan's general personal jurisdiction statute.

And, Nuyorican Productions is not consenting to jurisdiction.

### 2.     General Jurisdiction – Individual Defendant

Neither the complaint nor Gray-El's response to the motion to dismiss

suggests that the Court may exercise general personal jurisdiction over Lopez.

Under Michigan law, to do so, one of the following requirements must be

satisfied:

> The existence of any of the following relationships
> between an individual and the state shall constitute a
> sufficient basis of jurisdiction to enable the courts of

> record of this state to exercise general personal
> jurisdiction over the individual or his representative and
> to enable such courts to render personal judgments
> against the individual or representative.
>
> (1) Presence in the state at the time when process
> is served.
>
> (2) Domicile in the state at the time when process
> is served.
>
> (3) Consent, to the extent authorized by the
> consent and subject to the limitations provided in
> section 745.

M.C.L. § 600.701.  The complaint states that Lopez is a resident of California;

nothing elsewhere in the complaint or the exhibits suggests that her domicile was

in Michigan at the time of service of process or her consent.  The returned

summons indicates that Lopez was served in California, not Michigan, (*See also*

Lopez's affidavit, ECF No. 28-3, PageID.220-22), and she is clearly not

consenting to being sued in Michigan.  Consequently, Gray-El has not established

a *prima facie* case of general personal jurisdiction over Lopez.

>              3.      Specific Jurisdiction

          Under Federal Rule of Civil Procedure 4(k), the Court must next look to the

Michigan long-arm statute, Mich. Comp. Laws § 600.715, to determine whether

specific personal jurisdiction over the corporate defendants exists in this

case.  Mich. Comp. Laws § 600.715 provides:

The existence of any of the following relationships between a corporation or his agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which creates any of the following relationships:

(1) The transaction of any business within the state.

(2) The doing or causing any act to be done, or consequences to occur, in the state, resulting in an action for tort.

(3) The ownership, use, or possession of any real or tangible personal property situated within the state.

(4) Contracting to insure any person, property, or risk located within this state at the time of contracting.

(5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

The relevant Michigan statute governing specific personal jurisdiction over individuals provides as follows:

The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to

render personal judgments against the individual or his
representative arising out of an act which creates any of
the following relationships:

(1) The transaction of any business within the
state.

(2) The doing or causing an act to be done, or
consequences to occur, in the state resulting in an
action for tort.

(3) The ownership, use, or possession of real or
tangible personal property situated within the state.

(4) Contracting to insure a person, property, or risk
located within this state at the time of contracting.

(5) Entering into a contract for services to be
rendered or for materials to be furnished in the
state by the defendant.

(6) Acting as a director, manager, trustee, or other
officer of a corporation incorporated under the
laws of, or having its principal place of business
within this state.

(7) Maintaining a domicile in this state while
subject to a marital or family relationship which is
the basis of the claim for divorce, alimony,
separate maintenance, property settlement, child
support, or child custody.

Mich. Comp. Laws § 600.705.

Plaintiff has not alleged that the defendants' actions fall within one of the

long-arm statute's enumerated categories, and failing to make a *prima facie*

showing and establishing personal jurisdiction with reasonable particularity is a

basis to grant the defendants' motion to dismiss for lack of personal jurisdiction. Even if Gray-El established that one of the categories is satisfied for both defendants, "constitutional concerns of due process limit the application of [the long-arm statute]." *Theunissen*, 935 F.2d at 1459 (citation omitted). A defect in the due process considerations "would foreclose the exercise of personal jurisdiction even where a properly construed provision of the long-arm statute would permit it." *Id*. Considering plaintiff's status as a *pro se* litigant, the undersigned will proceed to the question of whether exercising personal jurisdiction would violate due process in this case.

Specific jurisdiction provides adjudicatory authority over suits arising out of or relating to the defendant's contacts with the forum State. *Daimler AG,* 134 S.Ct. at 754 (citation omitted). Generally, a plaintiff must show that the nonresident defendant has purposefully established significant contact with the forum State and that the plaintiff's cause of action arises out of or is related to those activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). The Sixth Circuit has identified three considerations to determine whether limited personal jurisdiction extends to a defendant in a particular case:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences must

> have a substantial enough connection with the forum
> state to make the exercise of jurisdiction over the
> defendant reasonable.

*Gerber v. Riordan,* 649 F.3d 514, 518 (6th Cir. 2011) (internal quotations omitted);

*Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir.

1968).

a.    Purposeful Availment

The "purposeful availment" requirement is satisfied when the defendant's

contacts with the forum State "proximately result from actions by the defendant

*himself* that create a substantial connection" with the forum State, and when the

defendant's "conduct and connection with the forum are such that he should

reasonably anticipate being haled into court there." *Beydoun v. Wataniya*

*Restaurants Holding, Q.S.C.,* 768 F.3d 499, 505–06 (6th Cir. 2014) (emphasis in

original) (internal quotations omitted).  The purposeful availment inquiry focuses

on "whether the defendant has engaged in some overt actions connecting the

defendant with the forum [S]tate." *Id.* at 506 (internal quotations omitted).  If the

plaintiff can demonstrate purposeful availment, then the absence of physical

contacts with the forum State will not defeat personal jurisdiction over a

nonresident defendant.  *See Burger King,* 471 U.S. at 476.

There is no allegation of overt actions connecting the defendants with

Michigan in Gray-El's complaint.  Gray-El only alleges that Lopez and Nuyorican

16

Productions are California residents and that they infringed on his copyrighted show, *Let's Start the Dance* by creating/producing the show *World of Dance*. Again, because Lopez and Nuyorican submitted affirmative evidence showing that this Court lacks jurisdiction over them, mere allegations of jurisdiction are not enough. *Theunissen*, 935 F.2d at 1458. Gray-El needed to set forth, by affidavit or otherwise, specific facts showing jurisdiction. *Id.* This, he has not done.

It is possible that, by acknowledging that NBC conducts continuous business within Michigan through broadcasting television shows in Michigan, (ECF No. 29, PageID.236), Gray-El is arguing that this Court has jurisdiction over Lopez and Nuyorican Productions because *World of Dance* in broadcast in Michigan and they work in some capacity on the show.

A defendant's direct involvement in distributing a television show or other work of art in the forum state can be enough to establish personal jurisdiction in the forum state. In *Bridgeport Music*, the plaintiffs brought a copyright infringement lawsuit in the Middle District of Tennessee against a Texas corporation (which the court to referred to as "NTW") and a Florida company (which the court referred to as "DM"). *Bridgeport Music*, 327 F.3d at 475. The district court dismissed the case for lack of personal jurisdiction, and on appeal the Sixth Circuit affirmed the dismissal of NTW but reversed the dismissal of DM. *Id.* at 477, 485, 485. In doing so, the appellate court adopted what is known as the

"stream of commerce 'plus' theory of specific personal jurisdiction.  *Id*. at 479–80.

Under that theory, for a defendant to purposely avail himself of the privilege of

acting within a forum state, he must do more than merely place a product into the

stream of commerce.  *Id*. at 479 (citing *Asahi Metal Indus. Co., v. Superior

Court,* 480 U.S. 102 (1987)).

In that case, the plaintiff argued that both defendants had licensing

agreements with third parties that distributed the allegedly infringing music

nationwide—and thus in Tennessee.  *Id.*  However, the plaintiff had not shown that

defendant NTW "did anything to direct its distributor's activities into Tennessee,"

*Parker v. Winwood*, 938 F.3d 833, 841 (6th Cir. 2019), but had shown that

defendant DM affirmatively sought distribution in all fifty states.  *Bridgeport

Music*, 327 F.3d at 483.  "Put differently, while NTW was 'merely aware' that its

distributor was likely to spread its music throughout all fifty states, DM made a

'deliberate decision' to pursue such dissemination."  *Parker*, 938 F.3d at 841

(citing *Bridgeport Music*, 327 F.3d at 483).  Accordingly, the court did not have

personal jurisdiction over NTW, but did have jurisdiction over DM.

Similarly, in a more recent case, the Sixth Circuit held that the district court

lacked personal jurisdiction over a songwriter because there were no facts

demonstrating that he "specifically directed the distribution [of the song] into

Tennessee."  *Id.*  Neither the songwriter's membership in the band, nor the band's

18

distribution contract, were enough to confer personal jurisdiction.  The case would have been different if the plaintiff had shown that the band requested or required distribution of their music within all fifty states.  *Id.*

The facts available to the Court show that Lopez is an executive producer of and a judge on *World of Dance*, (ECF No. 28-2, PageID.220), and Nuyorican Productions is Lopez's company.  (ECF No. 28, PageID.200).  It is not clear what role Nuyorican Productions plays in *World of Dance*.  Lopez asserts that she has no involvement in the distribution of *World of Dance* and that she has not participated in any development, production, or post-production activities associated with *World of Dance* in Michigan.  (ECF No. 28-2, PageID.221).  Nuyorican Productions' secretary asserts that, based on his information and belief, the company has not participated in any development, production, or post-production activities associated with *World of Dance* in Michigan, and that it has no involvement in the distribution of *World of Dance*.  (ECF No. 28-3, PageID.225).

What is missing in this case is any evidence, or even an allegation, that Lopez and/or Nuyorican Productions directed the distribution of the show within the United Stated or specifically within Michigan.  Rather, Lopez and Nuyorican Productions affirmatively stated that they have no involvement in the distribution of *World of Dance*, into Michigan or otherwise.  (ECF No. 28-2, PageID.221, ¶ 7; ECF No. 28-3, pageID.225, ¶ 10).  Without any facts or allegations to suggest

otherwise, it appears that plaintiff has not set forth sufficient facts to show that Lopez or Nuyorican Productions affirmatively sought distribution of *World of Dance* into Michigan.  As in *Parker*, *supra*, nothing in this record shows that the defendants were anything more than merely aware that the show might one day be broadcast in Michigan.  Thus, the Court lacks personal jurisdiction over them.

Because Gray-El did not establish purposeful availment, and the undersigned having concluded that exercising personal jurisdiction over the defendants offends due process in this case, the Court need not analyze the second and third prongs of the test.  *See LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1303 (6th Cir. 1989) ("each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked"); *See, Inc. v. Imago Eyewear Pty., Ltd.*, 167 Fed. Appx. 518 (6th Cir. 2006) ("As we find that the first prong is not satisfied, analysis of the second and third prongs is unnecessary.").

B.    Rule 12(b)(6) Motion to Dismiss – Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S.

41, 47 (1957)).  A plaintiff is also obliged "to provide the grounds of his

entitlement to relief," which "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Association*

*of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007)

(quoting *Twombly*, 550 U.S. at 555 (citations and internal quotation marks

omitted)).  In *Iqbal*, the Supreme Court explained that a civil complaint only

survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 677 (2009).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  And,

while a complaint need not contain "detailed" factual allegations, its "[f]actual

allegations must be enough to raise a right to relief above the speculative level on

the assumption that all the allegations in the complaint are true." *Id.* (quoting

*Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted)); *see also*

*League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir.

2007) (emphasis in original) (the factual allegations in a complaint need not be

detailed but they "must do more than create speculation or suspicion of a legally

cognizable cause of action; they must show *entitlement* to relief.").

A complaint filed by a *pro se* plaintiff must be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted).  Thus, when applying *Twombly*, except as to a claim of fraud, the Court must still read plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519 (1972), and accept plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992); *Erickson*, 551 U.S. at 93-94 (The Court of Appeals improperly departed "from the liberal pleading standards set forth by Rule 8(a)(2)" and failed to liberally construe" the *pro se* complaint at issue.).

C.    Copyright Infringement

Title 17 of the United States Code protects owners' copyrights in creative works. 17 U.S.C. §§ 101-122.  "The elements of a copyright-infringement claim are (1) ownership of the copyright by the plaintiff and (2) copying by the defendant." *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 581 (6th Cir. 2007). For purposes of the motion to dismiss only, defendants do not contest that Grey-El owns a valid copyright in the Treatment.  The essential question is thus whether defendants unlawfully copied any elements of Gray-El's dance show, *Let's Start the Dance*.

To establish that a work has been copied, a plaintiff must present either (1) direct evidence of the defendant's copying, or (2) prove it indirectly by showing that (a) the defendant had access to the plaintiff's work and (b) that there is substantial similarity between it and the defendant's work, thus giving rise to an inference of copying.  *Bridgestone Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009).

Because "copyright infringement lends itself readily to abusive litigation, since the high cost of trying such a case can force a defendant who might otherwise be successful in trial to settle in order to avoid the time and expenditure of a resource intensive case ... greater particularity in pleading, through showing 'plausible grounds', is required."  *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting Inc.*, 299 Fed.Appx. 509, 512 (6th Cir. 2008).  Showing plausible grounds means pleading "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [copyright infringement]."  *Id.* (internal citation omitted).

1.    Access

Defendants argue that the claim against them should be dismissed because Gray-El did not plead that they had access to his work.  "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work."  *Murray Hill Publications, Inc. v. Twentieth Century Fox Film*

23

*Corp*., 361 F.3d 312, 316 (6th Cir. 2004) (citation omitted); *see also Ellis v. Diffie,* 177 F.3d 503, 506 (6th Cir. 1999) ("Access is essentially 'hearing or having a reasonable opportunity to hear the plaintiff['s] work and thus having the opportunity to copy.'"). "Although 'evidence that a third party with whom both the plaintiff and defendant were concurrently dealing had possession of plaintiff's work is sufficient to establish access by the defendant,' '[a]ccess may not be inferred through mere speculation or conjecture.'" *Ellis,* 177 F.3d at 506 (citation omitted).

Defendants are correct that Gray-El does not allege that Lopez or NBC had access to his dance show. One of the exhibits to the complaint is a letter to Lopez at Nuyorican Productions dated May 9, 2011, years before *World of Dance* was broadcast. In this letter, Gray-El did not disclose any details about the show. He wrote only that he had written and created a "highly competitive" dance reality show. He said he would disclose the treatment and the name of the show after Lopez signed a confidentiality and non-disclosure agreement. (ECF No. 7, PageID.76). Lopez did not respond to the letter; and thus she did not receive a copy of the treatment. Assuming Lopez in fact read this letter, since the treatment was not attached, it cannot be said that Gray-El has demonstrated Lopez's access to his dance show through this letter.

In his response to the motion to dismiss, Gray-El contends that the treatment "had the potential" to be viewed "throughout cyberspace." (ECF No. 29, PageID.229-30). What Gray-El appears to be asserting is that, since Debbie Allen did not return to the treatment to him after he faxed it to her, it ended up on the internet sometime thereafter. Gray-El does not allege that Debbie Allen had any contact with anyone at NBC regarding his show or that Allen played any role in the production of *World of Dance*, which might allow for the inference that Allen gave NBC access to the treatment. As noted above, mere speculation or conjecture as to a defendant's access to copyrighted work is insufficient to establish access. *See Nicholls v. Tufenkian Import/Export Ventures, Inc.,* 367 F. Supp. 2d 514, 521–22 (S.D.N.Y. 2005)) (finding that the availability of a copyrighted work on a website does not constitute access where the alleged infringer has not been shown to have visited that website). The mere fact that the treatment *may have* been published on the internet does not allow for the inference that the defendants accessed the treatment online. *Building Graphics, Inc. v. Lennar Corp.*, 866 F. Supp. 2d 530, 541 (W.D.N.C. 2011).

Where the plaintiff cannot prove access, the copyright infringement claim can still succeed, but only by proof of a higher level of similarity than the substantial similarity standard. *See Ellis,* 177 F.3d at 507 (noting that "[s]ome case law indicates that the stronger the similarity between the two works in question,

the less compelling the proof of access needs to be" (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[B])).  The quantum of similarity that will substitute for proof of access is "striking similarity."  Such striking similarity "preclude[s] the possibility of independent creation" of the work. *Murray Hill*, 361 F.3d at 316 (citation omitted).

The Sixth Circuit has indicated that proof of access can affect the degree of proof of similarity required to show copyright infringement and vice versa:

> [I]n some cases[,] the relationship between the degree of proof required for similarity and access may be inversely proportional: where the similarity between the two works is strong, less compelling proof of access may suffice. [Citing *Ellis v. Diffie*, 177 F.3d 503, 507 (6th Cir. 2004).] *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (stating that under the "inverse ratio rule," a lower standard of proof of similarity is required where a high degree of access is shown); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) (stating that "a case could occur in which the similarities were so striking that we would reverse a finding of no access, despite weak evidence of access (or no evidence thereof other than the similarities).").

*Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004).

Despite the higher hurdle plaintiff must meet to demonstrate copying because of his failure to sufficiently allege access, defendants argue that plaintiff cannot meet the lower substantial similarity standard.  Defendants similarity argument is limited to assessment of substantial similarity.

2.     Substantial Similarity

26

"Substantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable [sic] expression by taking material of substance and value." *Stromback*, 384 F.3d at 297 (internal quotation omitted).  Gray-El's complaint allegations do not plausibly raise the question whether the two works are substantially similar.  He alleges that he sent the treatment for his show to Debbie Allen, and Allen did not send it back after rejecting it.  (ECF No. 1, PageID.5).  He says that on May 8, 2017, he "was advised that a show" like his was on television.  The show was produced by Lopez and NBC.  He wrote a letter to Lopez and NBC about the allegedly infringing work, but did not hear back.  (*Id.*).  These allegations leave much to be wanting.  For instance, what is the work NBC and Lopez created that infringes on Gray-El's show?  And, importantly, how are the two works similar?  It is not until the exhibits that the defendants and the Court learn that the allegedly infringing show is *World of Dance*.  Gray-El provided the treatment for his show, but still made no effort to demonstrate any substantial similarities between the two works.

In short, there are no allegations in the complaint that demonstrate that the two works are substantially similar, let alone allegations pled with the requisite particularity required in a copyright infringement case.  In *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting Inc*., 299 F. App'x 509, 511 (6th Cir. 2008),

the Sixth Circuit upheld the dismissal of the plaintiff's complaint because it contained a "blanket assertion of entitlement to relief" without "any factual allegations supporting that assertion." *Id.* at 512; *see also Livia v. Sly, Inc.*, 2018 WL 454401 (N.D. Ohio Jan. 17, 2018) (dismissing copyright infringement claim because bare allegations insufficient to establish copying beyond unprotectable ideas and because plaintiff did not allege specific facts describing her copyrighted work or defendant's alleged infringing work).

Here, though we know the allegedly infringing work is *World of Dance*, and that *World of Dance* is broadcast on NBC, a national television network, the complaint fails to allege how NBC's show infringes on plaintiff's copyrighted treatment. For this reason, the complaint should be dismissed.

In addition to the insufficient factual allegations, the complaint should be dismissed for another reason: the elements of the works that are similar are unprotectable by copyright. The undersigned is mindful that determining substantial similarity at the motion to dismiss stage is to be undertaken with caution. As this Court has recently pointed out, "[t]he Sixth Circuit has cautioned that granting summary judgment motions in copyright infringement cases is generally disfavored because the issue of "substantial similarity" can present a close factual question." *Eggleston v. Daniels*, 2016 WL 4363013, at *7, n. 5 (E.D. Mich. Aug. 16, 2016) (citing *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009)).

Typically, summary judgment motions are premised on a developed record, unlike Rule 12(b)(6) motions.  However, dismissal at the Rule 12 stage by comparing the two works for substantial similarity may be permissible "under appropriate circumstances."  *Bowen v. Paisley*, 2013 WL 6237469, at *6 (M.D. Tenn. Dec. 3, 2013).

The undersigned suggests that this case presents the appropriate circumstance to compare the two works at this stage.[2]  First, both parties submitted exhibits that describe their respective shows.  The undersigned has facts to compare.  "Where, as here, the works in question are made part of the pleadings in the case, it is entirely appropriate for the district court to address the issue of substantial similarity in connection with a motion to dismiss."  *Lyles v. Capital-EMI Music Inc*., 2013 WL 6000991, at *4 (S.D. Ohio Nov. 12, 2013) (citing *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir. 2010)) ("If, in making that evaluation, the district court determines that the two works are not substantially similar as a matter of law, the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief.") (citations and internal quotations

---

[2] Other courts have dismissed copyright infringement claims at the motion to dismiss stage for lack of substantial similarity.  *See, e.g.*, *Livia v. Sly, Inc.*, 2018 WL 454401 (N.D. Ohio Jan. 17, 2018); *Brown v. Twentieth Century Fox Home Entertainment*, 2015 WL 5081125 (E.D.Ky. Aug. 27, 2015);  *Lyles v. Capital-EMI Music Inc*., 2013 WL 6000991, at *4 (S.D. Ohio Nov. 12, 2013); *Taylor v. Victoria's Secret Stores, Inc.*, 2011 WL 13097641 (W.D. Tenn. Sept. 29, 2011).

omitted)).  Second, in this case, the undersigned need not get too far into the weeds of comparing the shows for substantial similarity.  Rather, it is clear that the elements of the show that are similar, i.e. those elements to which Gray-El points to show infringement in his response brief, are unprotectable ideas or *scenes a faire*.  Thus, Gray-El has not met the legal test for copyright infringement.

When determining whether two works are substantially similar, the Court engages in a two-step analysis.  First, "the court must 'filter' out elements of the work that are not original to the author."  *Bridgeport Music,* 585 F.3d at 274 (quoting *Murray Hill*, 361 F.3d at 318).  Copyright protection is limited to the "expression of ideas" in a work – those aspects "that display the stamp of the author's originality" – and does not extend to ideas themselves. *Stromback*, 384 F.3d at 296 (internal citations omitted).  Scènes à faire, or "stock themes," "the indispensable or standard aspects of a work, or those that 'follow directly from unprotectable ideas' should be filtered out as well."  *Bridgeport Music*, 585 F.3d at 274 (footnote omitted) (quoting *Murray Hill*, 361 F.3d at 320).  "[N]atural elements in a story about a college fraternity," for example, include "parties, alcohol, co-eds, and wild behavior."  *Stromback*, 384 F.3d at 298.  "Elements such as drunks, prostitutes, vermin and derelict cars" would similarly not be afforded copyright protection "in any realistic work about [...] policemen in the South Bronx."  *Id.* (quoting *Walker v. Time Life Films*, 784 F.2d 44, 50 (2nd Cir. 1986)).

After excising unprotectable ideas and stock themes, the court must determine whether the relevant portions of the allegedly infringing work are substantially similar to the protectible elements of the artist's work.  *Bridgestone,* 585 F.3d at 274.  "Substantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable [sic] expression by taking material of substance and value."  *Stromback*, 384 F.3d at 297 (internal quotation omitted).  The court "examine[s] the theme, characters, plot, sequence, pace, and setting for similarities."  *Id.*  "[T]he copying of a relatively small but qualitatively important or crucial element can be an appropriate basis upon which to find substantial similarity." *Bridgestone*, 585 F.3d at 275; *see also Stromback*, 384 F.3d at 297 ("The misappropriation of even a small portion of a copyrighted work may constitute an infringement under certain circumstances. Even if a copied portion [is] relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity."). "[R]andom similarities scattered throughout the works are not a proper basis for a finding of substantial similarity." *Stromback*, 384 F.3d at 297 (internal quotation omitted).

In making a substantial similarity determination, the undersigned considers the complaint and exhibits attached thereto, as well as the exhibits attached the

motion to dismiss—video of *World of Dance* episodes and a description of *World of Dance* taken from the show's website.  The Court may consider documents attached to the motion to dismiss, such as the description of the show *World of Dance* and video clips of the show, because the show is referred to in the complaint and is central to plaintiff's claims.  *See Eggleston v. Daniels*, 2016 WL 4363013, at *4 (E.D. Mich. Aug. 16, 2016).

       3.    Discussion

With these principles in mind, the undersigned finds that *Let's Start the Dance* and *World of Dance* are not substantially similar as a matter of law.  As an initial matter, the shared premise of the two shows—a dance competition show featuring high-level dancers—is unprotectable. *See Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Calif. 2008) (Holding that the general theme of reality programming, and in particular a reality weight-loss challenge show, is an unprotectable idea).  Gray-El seems to suggest that *World of Dance* infringes on his copyright because it is a dance show featuring high-level dancers.  But, the idea of dance competition show is merely that, an idea.  Ideas are not protectable.  What is protectable is the *expression* of that idea.

Many of the elements found in both shows flow from the idea of a dance show as "stock themes," and are likewise unprotectable.  Among these are the existence of a competition generally, judges, an audience, rounds of competition

32

and elimination, a host or hosts, and a prize or prizes for the winner. *See Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1295 (C.D. Calif. 2008) (Finding that "scenes a faire" in a reality weight-loss show such as contestants, a competition, experts who act in advisory role, and prizes to be unprotectable elements of a weight-loss reality show); *Bethea v. Burnett*, 2005 WL 1720631, at *11 (C.D. Cal. Jun. 28, 2005) ("At the most abstract level, or at the level of 'ideas,' there is some similarity between [the reality shows] C.E.O. and The Apprentice. For example, Plaintiffs claim that the 'plot' of both reality television programs is similar because both programs depict a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation.... However, Plaintiffs' alleged similarity is nothing more than a string of generic 'ideas' which is not protected by copyright law."); *CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc.*, 2012 WL 13013027, at *6 (C.D. Calif. June 21, 2012) ("[C]ompetition and expulsions are the life blood of reality programming," and thus are unprotectible elements of a reality show).

Gray-El lists the elements of *World of Dance* he believes are substantially similar to his show.  These are: that the competition is highly competitive or "high-level", that both shows showcase the best dancers from around the world, and that there are competitors, judges, hosts, coaches, and an audience in both shows.

(ECF No. 29, PageID.241-42).  He cites no support for the proposition that drawing high-level dance contestants from around the world constitutes more than stock elements that are copyrightable.  It is not a novel idea that a reality competition show showcase top performers in the given activity, or to draw these performers from a variety of places, including outside the United States.  Rather, these are elements that follow naturally from the unprotectible idea of a dance competition show.  The same is true for the fact that both shows have competitors, judges, hosts, and an audience.  The similar elements Gray-El identifies are ideas, or classic *scenes a faire*.  Consequently, he has not demonstrated or sufficiently alleged infringement of the protectable elements of a copyrighted work.

After filtering out the unprotectible elements such as the idea of a dance show and *scenes a faire*, the final step is to determine whether the allegedly infringing work is substantially similar by comparing the two works.  Although it appears that most, if not all, of the elements of both shows have been filtered out, even comparing these similar elements reveals that the two shows are not substantially similar such that a reasonable person could conclude that the defendants appropriated Gray-El's protectable expression.  In short, for the reasons explained below, Gray-El's expression of his idea for a dance competition show is not substantially similar to *World of Dance*.

As noted above, courts often look to the theme, characters, plot, sequence, pace, and setting for similarities. *Stromback*, 384 F.3d at 297. These characteristics are not as readily extracted in a reality competition show as they are in dramatic works. Still, these characteristics, or elements similar to them, are helpful in drawing distinctions between two reality shows. *See, e.g.*, *Milano*, 584 F. Supp. 2d at 1296.

The "plot" or sequence of events in a competition show has been discussed as "contest structure." *See id.* The *Let's Start the Dance* treatment contains several key elements (sequence or plot) that are not found in the *World of Dance*. First, after the audition for *Let's Start the Dance*, the competitors chose a partner (or a group, it is not clear whether this show is for dance duos only, or for larger groups as well). In *World of Dance*, the competitors enter the competitions with their group (or as an individual) already established and left unchanged by the show. These groups are placed into one of four categories based on age and number of group members: Junior, Junior Team, Upper, and Upper Team. Then, in *Let's Start the Dance*, the partners choose three songs and three dances (it is not clear whether they choose them randomly or pick them by preference) and must conduct research into the history of the songs and dances. In *World of Dance*, competitors chose their dance and song, and do not conduct any research. There are three rounds of competition in *Let's Start the Dance*, while there are five

rounds in *World of Dance*: The Qualifiers, The Duels, The Cut, Divisional Final, and World Final.  While both shows have or would have three dance judges, *Let's Start the Dance* would have the audience judge the music selection—an entirely different aspect to the dance competition show not found in *World of Dance*.  The score given to the music is added to the dance score for a total score.  Music does not have this kind of role in *World of Dance*, and the audience has no role in judging at all in the show.

Finally, *Let's Start the Dance* includes the additional features of "fancy dancers" and a live band to perform during the show and during commercial breaks.  These elements do not exist in *World of Dance*.

In sum, both shows contain similarities, but these similarities exist in elements that are not protectable, or the similarities are simply unprotectable ideas.  And, to the extent those similarities are copyrightable elements, *Let's Start the Dance* contains many elements not found in *World of Dance*, and *World of Dance* contains elements not found in *Let's Start the Dance*.  Accordingly, the two shows are not substantially similar such that "an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable [sic] expression by taking material of substance and value."  *Stromback*, 384 F.3d at 297 (internal quotation omitted).  For this additional reason, the complaint should be dismissed.

D.      Defendants Debbie Allen and Freeze Frame Entertainment, LLC

Gray-El alleges that he sent a copy of the treatment for *Let's Start the Dance* to Debbie Allen and Freeze Frame Entertainment, LLC in 2009.  (ECF No. 1, PageID.5).  He did not hear back from Allen or her company.  Gray-El provides more factual background in his response brief.  He says an employee of Debbie Allen's, or of Freeze Frame Entertainment, asked him to send the treatment for his show.  After he faxed it to Allen, the employee told him that Allen did not accept unsolicited material.  Gray-El asked that his treatment be sent back to him, but never heard from Allen or any of her employees again.  (ECF No. 29, PageID.229).  In May 2017, Gray-El learned of the show *World of Dance*, and then brought this case claiming that *World of Dance* infringes on his copyright for his show that he sent to Allen.  Gray-El does not allege that Allen of her company played in part in NBC's alleged copying of the show, nor that Allen separately copied the show.  He also does not allege that Allen or her company sent the treatment for his show to NBC or to defendant Lopez.  It appears that his claim against Allen and Freeze Frame Entertainment is centered on her keeping his treatment rather than sending it back, and an amorphous claim that his treatment ended up on the internet after Allen did not return it to him—insinuating that Allen put the treatment on the internet.  And, since it was on the internet, NBC or Lopez got hold of it and created a similar show in violation of his copyright.

Though not entirely clear, it appears that Gray-El is attempting to bring a contributory copyright infringement claim against Debbie Allen and Freeze Frame Entertainment.  Contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement claims are secondary infringement claims that depend on an underlying direct copyright infringement claim.  *See MGM Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936–37 (2005) (establishing the inducement test, which holds liable "one who distributes a device with the object of promoting its use to infringe copyright ... for the resulting acts of infringement by third parties"); *NCR Corp. v. Korala Assocs., Ltd.,* 512 F.3d 807, 816 (6th Cir. 2008) ("Contributory infringement occurs when one, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another.").  Having found that Gray-El does not state a claim for direct copyright infringement, above, the court recommends that his claims for secondary copyright infringement against Allen and Freeze Frame Entertainment should also be dismissed for failure to state a claim.[3]  *See Gordon v. Nextel*

---

[3] Where a plaintiff is proceeding *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action or appeal ... fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii)).  Accordingly, *sua sponte* dismissal of these defendants for failure to state a claim is permissible.  In addition to Gray-El's failure to state a claim against Allen and Freeze Frame Entertainment, the undersigned is concerned that these defendants have not been properly served.  The returned summons was signed by a registered agent.  (ECF No. 21, PageID.134-35).  It does not appear that service by certified mail to a registered agent satisfies service on an individual or a business organization under Fed. R. Civ. P. 4(e) and (h), under Michigan law for service of an individual (Mich. Ct. Rule 2.105(B)) or a limited liability company (M.C.R. 2.105(H)) (*see also Kana Inv. Corp. v. F.D.I.C.*, 2013

*Commc'ns & Mullen Adver.*, Inc., 345 F.3d 922, 926 (6th Cir. 2003) (holding that the plaintiff's claim of vicarious liability could not prevail absent direct infringement); *Moses v. Youtube, Inc.*, 2014 WL 549205, at *11 (W.D. Tenn. Feb. 11, 2014).

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants NBC, Lopez, and Nuyorican Productions' motion to dismiss (ECF No. 26, 28) be **GRANTED**, and that the complaint be dismissed against them.

The undersigned further **RECOMMENDS** that defendants Debbie and Allen and Freeze Frame Entertainment, LLC be **DISMISSED** *sua sponte* for failure to state a claim against these defendants.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

---

WL 4029091, at *3 (E.D. Mich. Aug. 8, 2013)), or under California law for service on an individual (Cal. Code Civ. Proc. § 415.10, 415.20) or a corporation (Cal. Code Civ. Proc. §§ 416.10, 416.20, 416.40).

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 18, 2019                  s/Michael J. Hluchaniuk
                                          Michael J. Hluchaniuk
                                          United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on <u>December 18, 2019</u>, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by United States Postal Service to the following non-ECF participant: <u>Alvin Gray-El, 17524 Third Street, Apt. #B-2, Detroit, MI  48238.</u>

<u>s/Durene Worth</u>
 Case Manager
(810) 341-7881
durene_worth@mied.uscourts.gov